**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

**JASON B.,**

        **Plaintiff,**

  v.                                     **Civil Action 1:23-cv-244
Judge Douglas R. Cole
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Jason B., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.     BACKGROUND**

Plaintiff filed his application for DIB in December 2019 and protectively filed his applications for SSI in October 2019, alleging that he was disabled beginning August 26, 2016, due to blind or low vision, bipolar, anxiety, social anxiety, manic depression, diabetes, PTSD, both rotor cuffs pain, high blood pressure, high cholesterol, panic attack. (R. at 233–49, 281). After his applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephonic hearing on February 2, 2022. (R. at 44–80). The ALJ denied Plaintiff's applications in a written decision on February 17, 2022. (R. at 22–43). When the Appeals Council denied review, that denial became the Commissioner's final decision. (R. at 1–7).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 7, 8, 9, 10).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as follows:

*** At the hearing, [Plaintiff] testified he is no longer able to work due to a combination of impairments. He stated he experiences pain in his right shoulder. He has had no surgery, physical therapy, or injections. He stated he experiences chronic back pain. He has not had surgery or injections but testified that he has had physical therapy for his back and has seen a chiropractor. [Plaintiff] stated he has been diagnosed with diabetes for many years and he takes both medication and insulin shots three times a day. He reported he experiences neuropathy symptoms in his hands and in his feet. He stated he experiences numbness and tingling in his ankles and in his feet, with the right foot being worse. He stated he experiences burning sensations in his heels. [Plaintiff] reported he experiences numbness and tingling in his wrists up to his elbow. He stated he experiences hip pain from arthritis that causes difficulty with moving and he experiences some vision problems, particularly at night. He reported he has COPD and bronchitis. [Plaintiff] stated he used to have an alcohol abuse problem but stopped drinking in 2019. He is generally able to perform personal care chores but may need assistance with socks and shoes due to back pain. He stated he has problems with his grip because of numbness and tingling in his hands. He reported he has problems with his memory, has difficulty remembering and following conversations and has anger outbursts due to bipolar disorder. [Plaintiff] stated he experiences daily anxiety attacks that come without warning. He stated he may become light-headed, have trouble breathing and feels sick to his stomach. He stated his wife is usually able to calm him down if she is there. He stated he has difficulty sleeping due to hip and should pain. He sees a mental health professional every three months but has not had psychiatric inpatient treatment. He takes several medications including diabetes medication, insulin, muscle relaxers and medication for his mental health impairments. [Plaintiff] stated he tries to assist with some household chores. He is able to stand and walk for less than 30 minutes before he must take a break. He stated he spends much of his day lying down with his legs elevated.

(R. at 31).

### B. Relevant Medical History

The ALJ summarized Plaintiff's medical records as to his mental health impairments as follows:

With respect to his anxiety, depression, and PTSD, [Plaintiff] received mental health treatment in October and November 2016 and in January 2017 for major

depressive disorder and generalized anxiety disorder. He received both medication management and some therapy. After one month on Lexapro, he remained depressed, agitated, and socially isolated. His affect was congruent to sullen mood. His thought process was organized and logical. He denied suicidal ideation (Exhibit 4F). At mental health visits from January 2017 to January 2020, he continued to complain of anxiety and depression. He reported he does not communicate with anyone other than his wife and children. He admitted to limited conversation with others. He reported anxiety and depression consume his day and he is overwhelmed with stress daily. He had clear and focused speech. His thought process was logical. He denied suicidal ideation. At his visits, he generally reported situational stressors and continued to state he did not like to be around others.

His mental status examinations were generally within normal limits except for mood changes. In February 2018, he reported doing well, denied side effects, and stated that he would be starting a new job that week (Exhibit 7F). He continued to attend visits from April to September 2020. Little was reported during his visits other than he stated he was doing okay and denied side effects. He stated he had panic attacks three to four times a week and felt anxious more than 2/3 of the time. No observations were made on mental status examinations. At his August 2020 visit, he reported moderate symptoms. He did not feel Klonopin was helping anymore and wanted to try something different. His provider prescribed valium. In September 2020, [Plaintiff] reported he was unable to take valium because it messed him up (Exhibit 10F p31). At another visit that month, he stated he last tried suicide two years ago by holding a gun to his head. He said he had a lot of things going through his mind and he was drunk. He presented with anxious mood but otherwise his mental status examination was within normal limits. The provider diagnosed major depressive disorder, recurrent, moderate. At regular visits from November 2020 to November 2021, [Plaintiff] reported he was doing well on medications. He had normal mental status examinations. He was anxious at his November 2021 visit but was also noted to be stable. He stated he was currently working on a garage and a motorcycle that he had recently gotten. The provider continued to refill his medication (Exhibit 12F). [The ALJ] note[d] [Plaintiff] has not generally received the type of medical treatment one would expect for a totally disabled individual. Since the alleged onset date, [Plaintiff] has only received conservative treatment for his severe physical impairments, mainly medication from his primary care provider at as needed visits. He has not sought the treatment of a specialist for his uncontrolled diabetes or asthma. He has not presented to the emergency room for blood sugar highs or lows or asthma exacerbation and has not required hospitalization. He has not required surgery, injections, or physical therapy. With respect to his mental health, [Plaintiff] has received consistent treatment, both medication management and therapy since the alleged onset date. He generally reports he is doing okay and denies medication side effects. His doctor has also consistently prescribed the same medications, with only one change to valium that [Plaintiff] did not tolerate. Mental status examinations were consistently within normal limits except for mood changes. [Plaintiff] has not presented to the emergency room for worsening depression or anxiety symptoms

3

> nor required inpatient treatment since the alleged onset date. I have accommodated [Plaintiff]'s physical impairments with light exertional work with occasional climbing but no ladders, ropes, or scaffolds; occasional balance, stoop, crouch but no kneel or crawl; frequent handling and fingering; avoidance of concentrated exposure to fumes, odors, dust, and poor ventilation; and avoidance of hazards. I have accommodated [Plaintiff]'s mental impairments (including difficulty controlling anger and his panic attacks) with a limitation for simple, routine repetitive tasks and low stress work. I have specifically accommodated his allegations of difficulty in interaction with others, anger issues, and panic symptoms, with occasional, superficial interaction with supervisors and coworkers and no interaction with the public.
>
> The record contains additional treatment records, including office visits, imaging, and potential opinions (Exhibits 1F, 3F, and 6F). These medical records were prior to the application date and reflect fairly routine treatment. I find it was unnecessary to discuss these additional records in detail as they are not useful in determining [Plaintiff]'s severe impairments and residual functional capacity during the relevant time period. Any medical opinions offered during this time period are not found persuasive as they are of limited usefulness in determining [Plaintiff]'s residual functional capacity for the period at issue.

(R. at 32–34, footnote omitted).

### C. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through June 30, 2023. (R. at 27). He has not engaged in substantial gainful employment since August 26, 2016, the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments: diabetes, asthma, hypertension, obesity, anxiety, depression, posttraumatic stress disorder (PTSD), and borderline intellectual functioning. (R. at 28). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (*Id.*).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb but no ladders, ropes, or scaffolds. He can occasionally balance, stoop, and crouch but must not kneel or crawl. He can perform frequent handling and fingering. He must avoid concentrated exposure to fumes, odors, dust, and poor ventilation. He must avoid hazards including heights and moving machinery. He is able to understand, remember, and

>carry out simple, routine, repetitive instructions. He can tolerate occasional, superficial interaction with supervisors and coworkers. He can tolerate no interaction with the public. He requires low stress jobs defined as no production-rate paced work, only occasional changes in job setting, and only occasional decision-making responsibilities.

(R. at 30).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that Plaintiff's symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (R. at 32).

The ALJ determined that Plaintiff is unable to perform his past relevant work as an industrial truck operator, landscape laborer, or his composite job comprised of components of both industrial truck operator and material handler. (R. at 36–37). The ALJ relied on testimony from a Vocational Expert ("VE") to determine that given Plaintiff's age, education, work experience and RFC, he was able to perform work that existed in significant numbers in the national economy, such as a marker, router, or power screwdriver operator. (R. at 37–38). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since August 26, 2016. (R. at 38).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In his Statement of Errors, Plaintiff contends that the ALJ's treatment of limitations opined by state agency psychological consultants, Karla Delcour, Ph.D. and Lisa Foulk, Psy.D, is not properly explained. So, says Plaintiff, the Court cannot determine if the ALJ's conclusion is supported by substantial evidence. (Doc. 8 at 6–13). More specifically, he says that the ALJ failed to explain why she did not include three limitations opined by the state agency psychological consultants which were more restrictive than those adopted in the RFC: (1) Plaintiff could work relatively independently without close over-the-shoulder supervision; (2) Plaintiff should have the ability to access a supervisor for support as needed; and (3) Plaintiff is capable of "brief" workplace social interactions. (*Id.*). The Commissioner counters that the ALJ properly evaluated the prior administrative findings in accordance with the new regulations for evaluating opinion evidence, considering the supportability and consistency factors, supported her decision with substantial evidence, and accommodated the opined restrictions through alternative portions of the RFC. (Doc. 9 at 4–10).

A [Plaintiff]'s RFC is an assessment of "the most [a claimant can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1) (2012). A [Plaintiff]'s RFC assessment must be based on all the relevant evidence in his or his case file. *Id*. The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical

6

findings.[1] 20 C.F.R. § 416.913(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. § 416.920c(b)(2). And although an ALJ may discuss how he or she evaluated the other factors, he or she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . . . " § 416.920c(b)(3). "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his [or her] conclusion.'" *Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No.

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (*see* § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 416.913(a)(2), (5).

7

1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

In evaluating the prior medical administrative findings of the state agency psychologists, the ALJ determined:

> State agency psychological consultants, Karla Delcour, Ph.D., and Lisa Foulk, Psy.D., reviewed [Plaintiff]'s mental health record and found [Plaintiff] to have understanding and memory limitations but that he could understand, remember, and sustain tasks that can be learned after a short demonstration. He would have sustained concentration and persistence limitations and should be limited to a routine environment with non-strict production standards. He would have social interaction limitations but appears capable of brief and superficial interactions with the general public, supervisors, and coworkers. He would do best in worksites in which he could work relatively independently and without close over-the-shoulder supervision. He would have adaptation limitations and should be limited to a routine environment with infrequent changes and access to a supervisor for support as needed (Exhibits 3A, 4A, 7A, and 8A). I find this opinion partially persuasive. Although they are non-treating, non-examining medical sources, the opinion is based upon a thorough review of the available medical record and a comprehensive understanding of Agency rules and regulations. I find this opinion is internally consistent and well supported by a reasonable explanation and the available evidence at the time they reviewed it. However, when considering all evidence in the record, including [Plaintiff]'s hearing testimony, I find that [Plaintiff] has the slightly different mental limitations as outlined in the residual functional capacity, including a limitation for no interaction with the public.

(R. at 36).

As Plaintiff identifies, it is unclear from the ALJ's summation how and why she departed from the state agency psychological consultants' opined limitations. (Doc. 8 at 6–13). Rather, despite finding the opinions supported and consistent, she simply stated that Plaintiff had "slightly different mental limitations . . . ." (R. at 36). Notably, she left out several limitations opined by the consultants from her ultimate RFC determination: (1) Plaintiff "[w]ould do best in worksites in which he could work relatively independently and without close over-the-shoulder supervision[;]" (2) Plaintiff "should be limited to a routine environment with infrequent changes

8

and access to a supervisor for support as needed[;]" and (3) Plaintiff was capable of "brief" social interactions. (R. at 100, 123).

To be sure, an ALJ is not required to adopt an opinion in full merely because she finds it persuasive. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 276 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (noting that an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."). Still, the ALJ's opinion—read as a whole—must build a logical bridge between the evidence and the ALJ's conclusions. *See Davis*, 2019 WL 5853389, at *5.

As an initial matter, the Undersigned addresses the Commissioner's arguments about whether the opined limitations are materially different from the adopted limitations. The Commissioner says, "[T]he ALJ accounted for the limitation about working relatively independently and without close over-the-shoulder supervision by restricting Plaintiff to only occasional superficial interaction with supervisors . . . ." (Doc. 9 at 9). Yet, the state agency consultants opined an outright prohibition, that Plaintiff work "without close over-the-shoulder supervision[.]" (R. at 100, 123). So, even if such interaction was occasional, it would seem to conflict with the consultants' opinions. Nor is it clear that over-the-shoulder supervision necessarily entails a depth of interaction beyond the superficial.

Similarly, the Commissioner says the ALJ "accounted for the limitation involving supervisory support by restricting Plaintiff to simple, routine, and repetitive instructions." (Doc. 9 at 9). The Commissioner says this routine, repetitive work precludes any need for supervisory

9

support. (*Id.*). But this does not necessarily follow. The state agency psychological consultants provided that Plaintiff should be limited to a "routine environment with infrequent changes *and* access to a supervisor for support as needed[.]" (R. at 100, 123) (emphasis added). In other words, the consultants provided that Plaintiff would still require access to a supervisor for support even if he worked in a routine environment with infrequent changes.

Lastly, the consultants opined that Plaintiff appeared "capable of brief and superficial interactions with general public, supervisors and co-workers."[2] (R. at 100, 123). In contrast, the ALJ found that Plaintiff "can tolerate occasional, superficial interaction with supervisors and co-workers[,]" and "no interaction with the public." (R. at 30). Broadly, Plaintiff says that "brief" means interactions must be short in duration, while "occasional" refers to the frequency of interactions, and thus the terms are not interchangeable. (Doc. 8 at 11–12) (citing *Charlee N. A. v. Comm'r of Soc. Sec.*, No. 2:22-cv-3085, 2023 U.S. Dist. LEXIS 9871, at *11–12 (S.D. Ohio Jan. 19, 2023), *report and recommendation adopted by* 2023 U.S. Dist. LEXIS 19098 (S.D. Ohio Feb. 3, 2023)). The Commissioner, meanwhile, says that "superficial" interactions are inherently "brief." (Doc. 9 at 8–9) (citing *Metz v. Kijakazi*, No. 1:20-cv-2202, 2022 WL 4465699, at *9–10 (N.D. Ohio Sept. 26, 2022) ("Although the Court acknowledges that a 'brief' interaction sounds as if it is more akin to a time-based limitation while 'superficial' has more of a qualitative connotation, superficial interactions, by their very nature, are *brief*, fleeting, and cursory.")). Because the Undersigned has already determined that the two prior limitations were materially different—and the analysis must therefore proceed—the Court need not resolve this final discrepancy.

---

[2] The consultants also concluded their social interaction limitations by stating "No public." (R. at 100, 123). So it is unclear the extent to which they believed Plaintiff was capable of interacting with the public. But, the parties focus here on whether the totality of Plaintiff's workplace interactions must be "brief."

10

Because the ALJ adopted materially different limitations than those opined by the consultants whose opinions she otherwise found persuasive, she must build a logical bridge between the evidence and that departure, such that the Undersigned can assess whether her conclusion was supported by substantial evidence. Again, the ALJ stated simply that Plaintiff had "slightly different mental limitations" than those opined by the consultants. (R. at 36). She made this determination in light of "all evidence in the record, including [Plaintiff's] hearing testimony." (*Id.*). Because she found the consultants' opinion "well supported by a reasonable explanation and the available evidence at the time they reviewed it[,]" this would seem to suggest later-produced evidence contributed to the ALJ's conclusion.

The reconsideration psychological consultant made her finding on October 9, 2020. (R. at 123). In reviewing the evidence supporting Plaintiff's anxiety, depression, and PTSD, the ALJ predominately relied upon medical records from the period reviewed by the consultants. (R. at 32–33). The ALJ did also note, however, that from November 2020 to November 2021, Plaintiff regularly visited a mental health provider, had normal mental status examinations, and reported he was doing well on medications. (R. at 33). While true that these records show normal examinations and continued compliance with a seemingly effective medical protocol (R. at 973–1021), the records do not—without further supporting explanation from the ALJ—explain why Plaintiff needed no limitations regarding over-the-shoulder supervision or access to supervisor support to explain workplace changes.

Similarly, while the ALJ stated she relied on Plaintiff's hearing testimony in deviating from the state agency psychological consultants (R. at 36), none of the ALJ's summary of Plaintiff's testimony (R. at 29–31) explains the discrepancies between the opined and adopted limitations. Nor does the testimony itself patently demonstrate why the opined limitations were unnecessary.

11

For instance, regarding over-the-shoulder supervision, Plaintiff testified that he had been fired from previous jobs because of anger outbursts, and when his attorney asked, "How do you feel when someone tells you that you're doing something wrong?" he responded, "I get aggravated and then I'll say something or I'll tell them to do it themselves." (R. at 68–70).

At base, the ALJ's limited explanation for departing from the state agency psychological consultants' opined limitations—even when viewed in the context of her opinion as a whole—does not build a logical bridge between the evidence and her conclusion. The Undersigned is therefore unable to make the ultimate determination about whether the ALJ's conclusion is supported by substantial evidence, and this matter must be remanded.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **SUSTAIN** Plaintiff's Statement of Errors (Doc. 8) and **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further

evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

    IT IS SO ORDERED.


Date: October 31, 2023            /s/ Kimberly A. Jolson
                                               KIMBERLY A. JOLSON
                                               UNITED STATES MAGISTRATE JUDGE